SOUTHWICK, J.,
for the Court.
¶ 1. The unmarried mother of three minor children died soon after the birth of her last child. The mother’s sister was appointed guardian of the person and the estate of all the children even though they had always lived with their father. The deceased’s sister and mother arranged for a malpractice suit to be brought on the children’s behalf against various medical providers. After the suit was settled, the children’s father sought to be named as their sole guardian. Instead, he was appointed as co-guardian and the guardianship by the children’s aunt continued. The father appeals, arguing that there is no reason to continue the aunt as a co-guardian. We agree, reverse, and remand.
FACTS
¶ 2. A guardianship for each of the three children was filed as a separate action. Three separate final judgments were entered. The appeals from the separate judgments have been consolidated.
¶ 3. In December 1998, Lakesha Monea Williams died at age twenty due to complications from the birth of her third child. The children’s father, Dave Anderson, has maintained custody of all the children. Anderson and Williams were not married, but there is evidence that the parents had lived together with the children since the birth of the oldest child, who was seven when her mother died. Physical custody of the children is not at issue here.
¶ 4. After Williams’s death, her sister and her mother hired an attorney to pursue a wrongful death and medical malpractice claim against the hospital and physicians who treated Williams. The mother of the deceased, Velma Williams, brought the suit as next friend of the children. From the testimony at the guardianship settlement hearing, we accept that Ms. Williams and the children’s aunt, Laura Hoover, were far more assertive than the father in arranging for the litigation and pursuing it to completion. Anderson made some contacts with the children’s attorney after the litigation commenced and testified that he was told that he need not and in fact could not bring a separate suit on the children’s behalf.
¶ 5. Apparently after a tentative settlement, Laura Hoover filed three separate petitions to be appointed general guardian of the three children on November 18, 2002, in Holmes County Chancery Court. After a hearing, Hoover was appointed general guardian of the children on December 19, 2002. She was authorized to bring a wrongful death suit on behalf of the three wards. In each of the petitions, Hoover stated that notice should be given to David Anderson of her desire to be appointed guardian for the children. Anderson would later allege, though, that notice was not given.
*493 ¶ 6. The settlement was approved by the chancellor for $1,230,000. After attorneys’ fees and expenses, plus a reimbursement to the court-appointed guardian for Lake-sha Williams’ funeral costs, there was about $665,000 to be divided among the three children. According to statements in the record, those funds are subject to the oversight of the chancellor and cannot be expended by whoever is guardian without court order.
¶ 7. About eight months after Hoover was named as guardian, Anderson filed motions to remove her and to have himself become the sole guardian of the person and estate of his children. The chancellor denied the motion to remove Hoover but appointed Anderson and Hoover as “co-guardians” of the estates on September 19, 2003.
¶ 8. Anderson appeals, alleging that he should be named as sole guardian in the absence of any basis on which to find that he is unsuitable. He also alleges that the initial appointment of Hoover was defective because he had not received notice of the action.
DISCUSSION
¶ 9. The only allegation of error that we find necessary to address is whether the chancellor should have removed the children’s aunt as guardian and allowed their father to be the only guardian.
¶ 10. Anderson argues there is no meaningful evidence to support that he is unsuitable to serve. Hoover alleges that Anderson is unsuitable because of his lack of diligence when his children’s possible entitlement to wrongful death benefits arose after the death of their mother. The reason the aunt was continued co-guardian was explained this way in one of the chancellor’s orders:
At trial, Dave Anderson testified that he inquired of a lawyer as to whether he could recover for the wrongful death of Lakesha Williams. The lawyer informed him that he could not recover for the wrongful death of Lakesha because they were never married.
Dave Anderson took no action to obtain counsel to represent the children in a wrongful death action of their mother.
Laura Hoover, the maternal aunt, obtained a lawyer and initiated a wrongful death action on behalf of the minor children.
Laura Hoover worked tirelessly to bring the lawsuit to a conclusion. She traveled from the lawyers office; she was deposed; attended the depositions [of] other parties, and did whatever the lawyer required of her.
Dave Anderson was deposed during the litigation of this matter, but he still did not take an active role in the litigation on behalf of his minor children.
Laura Hoover paid $7,500 [of her own money] to bury Lakesha Williams, and she made all of the funeral arrangements.
Although Lakesha Williams and Dave Anderson live[d] together for several years, Dave Anderson did not offer to pay any of the funeral expenses.
Dave Anderson was inconsistent in his testimony, particularly when questioned as whether he was financially providing for his children. Other testimony revealed that Mr. Anderson was receiving aid for dependent children.
¶ 11. The final point in this excerpt from the chancellor’s order concerns testimony from Anderson that he was providing financial assistance to the children. The assistance for the minor children was actually through a federal benefits program entitled Temporary Assistance to Needy Families. The chancellor interpreted Anderson’s testimony as claiming for *494 himself a personal financial contribution to the children that was untrue.
¶ 12. The children’s aunt, Hoover, testified that it was necessary for her to seek appointment as guardian of the children when she realized that Anderson was not going to file suit on their behalf. Anderson gave confusing and perhaps inconsistent testimony as to why he did not pursue the claim. He testified that he contacted an attorney three or four months after Williams’s death, but gave what appeared to be two versions of what the attorney told him. Anderson first testified that the attorney told him that since he had not been married to Williams, a recovery for wrongful death was impossible. Later in his testimony, Anderson says that the attorney told him that because a suit was already pending in the matter, that he could not file a suit.
¶ 13. The lawyer to whom Anderson referred was his counsel in a separate chancery matter in which Velma Williams sought grandparent visitation rights. Anderson testified to having participated in the visitation hearing with counsel and was aware of what transpired as a result of that hearing. Anderson also testified that he had only recently been made aware of the settlement and the guardianship. He specifically denied receiving notice of the guardianship when Hoover sought appointment. Anderson testified that he never gave Hoover consent to seek the guardianship, though he did give her consent to pursue a claim on behalf of the children. A transcript of the hearing on acceptance of the settlement offer reveals Anderson’s testimony that since Hoover was more knowledgeable about the case, she could function as guardian for purposes of that hearing.
¶ 14. The primary reason that the chancellor made Anderson share the guardianship responsibilities with Hoover is that Hoover pursued the wrongful death suit. Different ways in which his lack of zeal with the litigation reflected itself were stated in the chancellor’s findings. He also faded to pay for the expenses for Lakesha Williams’s funeral; Hoover paid them. Finally, Anderson was found not to have been candid about his support for the children, testifying that he was financially supporting them when instead it was a governmental benefits program providing-support. We categorize these perceived shortcomings as a lack of initiative and specifically a failure to assume responsibility.
¶ 15. Mississippi guardianships are controlled by statute. We find it useful to quote in part the one that is the most significant for our purposes:
The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education, and the care and management of their estates.... If either father or mother die or be incapable of acting, the guardianship devolves upon the surviving parent. ... But if any father or mother be unsuitable to discharge the duties of guardianship, then the court, or chancellor in vacation, may appoint some suitable person, or having appointed the father or mother, may remove him or her if it appear that such person is unsuitable, and appoint a suitable person.
Miss.Code Ann. § 93-13-1 (Rev.2004). This statute makes a surviving parent the preferred guardian for children. No distinction is made between situations in which the parents had been married and those in which they were not. Only if the parent is “unsuitable” will someone else be named to displace the natural guardianship possessed by natural parents.
*495 ¶ 16. Another statute reiterates this point by providing that a guardian other than a parent “shall not be entitled, as against the parent, to the custody of the ward ..- so long as the parent is “suitable” to have custody. Miss.Code Ann. § 93-13-5 (Rev.2004).
¶ 17. From these statutes, we glean the following standards: (1) The father and mother are joint natural guardians of a child, which includes guardianship of their child’s person and estate. (2) When one parent dies, the surviving parent becomes sole guardian of the child’s person and estate. (3) The natural parent will remain as guardian unless adjudicated as unsuitable. (4) If the natural parent is unsuitable, he or she may be removed and a suitable guardian named.
¶ 18. The chancellor’s decision first to name the aunt as sole guardian, potentially without participation in the hearing by the children’s father, and then to force the natural father to share guardianship with the aunt, was reached despite that Anderson has been the custodial guardian of the children ever since their mother’s death. We examine the record to find support for the chancellor’s finding that Anderson is not “suitable to serve as guardian of the estate alone because he failed [to] exhibit to this Court an ability to handle business affairs.” We summarize the chancellor’s concerns as being that Anderson failed to exhibit either ability or interest in handling financial responsibilities, especially the wrongful death suit but other matters too, and had relinquished if not abdicated his responsibilities to Hoover. An unstated but likely factor in the chancellor’s focus on Anderson’s maturity with financial issues is that over $600,000 was available for the children though subject to court control.
¶ 19. The validity of the chancellor’s decision primarily becomes a matter of whether a parent’s “suitability” can be denied in this way. Since Anderson is the natural father and the statutorily-mandated guardian absent a problem with suitability, may shortcomings of this sort prevent his sole supervision of his children and their estate?
¶ 20. Anderson points us to a precedent involving what he argues are far more egregious defects in a natural parent’s conduct which still did not prevent that parent from having custody of her children. In re Guardianship of Brown, 402 So.2d 354 (Miss.1981). In Brown, the natural mother had been found guilty of negligent homicide while serving in the United States Ah- Force; she was court-martialed and sentenced to a military prison. Id. at 355. The mother agreed that the grandparents should be guardians of her children while she was imprisoned. Once released, she petitioned to dissolve that guardianship. The Supreme Court reversed the chancellor’s decision to leave guardianship of the estate of the children with the grandmother. Despite the mother’s crime, there was no evidence that after her release from prison she was unsuitable to be the guardian of either the person or the estate of her children. Id.
¶ 21. A different authority is cited to us by co-guardian Hoover in support of the chancellor’s ruling. In that precedent, the sister of the deceased mother of the children gained custody over their father. Hosey v. Myers, 240 So.2d 252 (Miss.1970). The chancellor’s finding was affirmed that the father was not fit because of his emotional instability and the hostility of the children towards him. The father had been found in contempt after his divorce from the mother of the children, had beaten his second wife, threatened to kill her, and threatened to kill his children. Id. at 253. We do not have comparable evidence here.
*496 ¶ 22. Our analysis start with the presumption of the appropriateness of custody by a natural parent. In order to overcome that presumption there must be a clear showing that (1) the parent has abandoned the child, (2) immoral conduct by the parent is detrimental to the child, or (3) the parent is unfit to have custody of the child. Rodgers v. Rodgers, 274 So.2d 671, 673 (Miss.1973). This presumption applies not just to physical custody but also to control of the children’s estates, subject to continuing judicial oversight in cases in which that has properly been ordered.
¶ 23. The chancellor’s concern here was that Anderson could not manage the children’s affairs as well as could their aunt. This is similar to a chancellor’s decision that a father was “unprepared” to have custody and was “unsuitable” but without a finding that he was unfit based on abandonment, immoral conduct, or other unfitness. Carter v. Taylor, 611 So.2d 874, 876-77 (Miss.1992). On appeal, the Supreme Court reversed based on inadequate findings to support the ruling. The ease was remanded for specific findings on whether the father was unfit. Id. at 877. We considered giving the same response in this case and remanding. However, we conclude that the problem here is not in the chancellor’s findings but in the evidence. Accepting the chancellor’s conclusions that Anderson exhibited neither good judgment nor willingness to accept responsibility for some of the difficult decisions that fell to him after the death of the children’s mother, he was not shown to be unable to manage his children’s estate. The chancellor found that he was suitable to have physical custody of the children.
¶ 24. We accept that the chancellor was likely correct in her implied finding that the children’s aunt would be better at handling the estates than Anderson would be. That is not enough to deny the natural father his statutory right to guard both the person and the estates of his children. A review of what many parents have done in the handling of financial matters involving their children would likely find a basis for criticism. However, parental deficiencies that do not sink to the level of unfitness are not enough to deny parents the management of minor children’s financial affairs.
¶ 25. Since there is not on this record sufficient evidence of Anderson’s unsuitability, we reverse the judgment and order that he be named the sole guardian of the person and estates of his children. The chancellor’s own management of the judgment funds will be some protection for Anderson’s perceived inadequacies.
¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF HOLMES COUNTY APPOINTING CO-GUARDIANS IS REVERSED AND IT IS ORDERED THAT APPELLANT DAVE ANDERSON BE NAMED AS SOLE GUARDIAN OF THE PERSON AND ESTATE OF HIS CHILDREN. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.